UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

WESLEY WOODS,

<table>
<tr><td></td><td></td></tr>
</table>

|  |  |
|---|---|
| Petitioner, | **No. 1:13-cv-00906-MAT** |
|  | **DECISION AND ORDER** |

          -vs-

MARK L. BRADT, Superintendent,

                    Respondent.

───────────────────────────────

## I.   Introduction

     Proceeding <u>pro</u> <u>se</u>, Wesley Woods ("Petitioner" or "Woods")
filed a petition for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254, alleging that he is in state custody in violation of his
federal constitutional rights. Woods is presently incarcerated
based on a judgment entered against him on July 23, 2008, following
a jury verdict in Monroe County Court (Geraci, J.) of New York
State, convicting him of Murder in the Second Degree (felony
murder) (New York Penal Law ("P.L.") § 125.25(3)) and Robbery in
the First Degree (P.L. § 160.15(4)).

## II.   Factual Background and Procedural History

### A.   The Crime

     The convictions here at issue stem from the robbery of a
grocery store at 1037 North Street in the City of Rochester owned
by Saleh Saeed Abo-Ali ("Abo-Ali"), and the fatal shooting of Abo-
Ali during the course of that robbery.

On December 2, 2007, at approximately 7:35 p.m., Woods, Keon Anderson ("Anderson"), and Stefan Lewis ("Lewis"), entered the store wearing what the store's sole employee, Fadel El-Naham ("Naham"), described as "black clothing, big coats, hoodies that cover almost the whole side of the face". (T.326, 343). Anderson and Lewis pointed their guns at El-Naham and yelled at him that they would shoot him if he "call[ed] for the guy upstairs." (T.326, 331-32). They ordered him to come out from behind the counter and get on the ground.

El-Naham got on his knees with his hands behind his head. He observed that one of the men (later identified as Anderson) was wearing pants with yellow stripes on the back and flowers on both of the back pockets. (T.335). One of the other men (later identified as Lewis) went behind the counter and stole money, cigars, cigarettes, and other items.

Meanwhile, Woods, who was armed with a .45-caliber handgun, went to the back of the store where a door led to a second-floor apartment occupied by Abo-Ali and his wife. When Abo-Ali came downstairs, he was met by Petitioner and Anderson, who had a silver .357-magnum handgun. According to El-Naham, he heard four to five gunshots that sounded as though they were fired from more than one gun. Abo-Ali was struck in the torso by a bullet that was later determined to come from the .357-magnum used by Anderson during the robbery.

-2-

Woods, Anderson, and Lewis fled the store, but El-Naham followed them outside and saw them run across Bernard Street. He called 911, and Rochester Police Department ("RPD") Officer Otto Harnischfeger ("Officer Harnischfeger") responded to the scene. El-Naham provided descriptions of the intruders and turned over the VHS tape containing surveillance video of the store to Officer Harnischfeger. (T.261-63, 328). RPD Officer Patrick Carney's K-9 partner scent-tracked Woods, Anderson, and Lewis to a house at 466 Bernard Street, where multiple footprints in the snow led to the side door. Back-up was requested and officers began to set up a perimeter outside the house. RPD Sergeant Robert J. Wilson ("Sergeant Wilson") spoke to a woman who lived across the street, and asked her to call the occupants at 466 Bernard. She did so and Sergeant Wilson eventually spoke to a woman who lived at 466 Bernard. She told him no one was inside the house, and then gave the RPD permission to enter the house, and gave Sergeant Wilson the house key.

Sergeant Wilson entered the house at 466 Bernard with Officer Carney, Officer Cuyler Mooney and his K-9 partner, and Officer Richard Gerbino. They announced their presence and the presence of a police dog. They went upstairs to the attic and again announced their presence. Officer Carney and Sergeant Wilson observed a crawl-space in the attic with a black jacket and silver gun. They yelled out that they knew people were hiding inside the

attic because they saw the gun and jacket, but no one responded. Officer Carney saw someone moving behind the drywall towards the silver gun and the opening of the crawlspace. Officer Mooney's dog apprehended the man later identified as Anderson and Officer Carney grabbed the gun. Another man, later identified as Woods, said, "Don't let the dog bite me. I give up." (T.377). He showed his hands as he came out of the crawlspace and was placed in handcuffs. The officers tore down some dry wall and pulled out the third suspect, later identified as Lewis. Officer Nickolas Romeo patted Woods down and found a pair of black gloves in his left back pants pocket.

Petitioner was taken to the precinct briefly and then driven to the corner of North and Bernard Streets for a show-up procedure with El-Naham.

Also in the attic, the police found a cigar box, cigars, cigarettes, two one-dollar bills, clothing, and three guns. An investigator for the Monroe County District Attorney's Office returned to the house later and located $410 in cash in the attic crawlspace. Bullets and casings recovered from the grocery store were found to match two of the three guns seized from the attic of 466 Bernard Street. Woods' fingerprints were found on one of the guns used in the robbery.

-4-

B.    Petitioner's Statements to Police

After show-up identification procedure, Woods was driven to the Public Safety Building, and arrived there just after 10:00 p.m. He was placed in an interview room and handcuffed to the table.

At 5:20 a.m., Investigator Glenn Weather and Sergeant Mark D. Mariano joined Woods in the interview room. Investigator Weather read Woods his rights, and Petitioner agreed to speak with the police without an attorney present. Over the next hour, Woods repeatedly denied any involvement in the robbery. At about 6:15 a.m., Investigator Weather and Sergeant Mariano left the room.

When they returned at about 6:39 a.m., the officers told Woods that they had reviewed the surveillance videotape from the store. Woods told them "that he didn't shoot anybody" and asked for "time alone to think [about] it." (H.249-50). The officers left the room at about 7:05 a.m.

They returned at 7:55 a.m. and spoke with Woods until 8:10 a.m. When asked, Woods said he would like to watch the surveillance videotape, which he did between 8:10 and 8:18 a.m. Officer Cassidy was also present during Woods' viewing of the videotape. While it was being played, Officer Cassidy asked Woods if he was right-handed or left-handed, and Woods replied that he was right-handed. According to the officers, after viewing the video, Woods "put his head in his hands and said, 'I'm ready.'" (T.539-40). Woods "immediately began to tell [them] that, in fact, he was

-5-

there, and that he didn't kill the guy, that he was shooting in the air because he heard the one guy coming down the stairs as the robbery was going down." (H.253). Beginning at 8:20 a.m., Investigator Weather and Sergeant Mariano took a written statement from Woods. Investigator Weather read the statement aloud, and Woods read it to himself. After making several corrections to the written statement, Woods signed it at 8:36 a.m.

In the statement, Woods explained that he, Anderson, and Lewis had planned a robbery, and that he was carrying a black .45-caliber handgun that night. Woods was wearing black jeans with red stitching and a "puffy North Face jacket." They went to "the Arab store at the corner of North Street and Bernard Street," drew their guns and entered. (T.548-49). Woods stated that

> [t]here was a guy behind the counter, an Arab guy. Stefan [Lewis] went behind the counter and started pulling stuff- started putting stuff in the bag. The guy behind the counter started moving back and forth making me nervous. All of the sudden I saw the door in the back of the store start to open. I yelled, whose [sic] there, and fired a shot in the air. I saw a part of a shirt, but I didn't see the whole person and didn't know if he had a gun or something. So I fired another shot in the air to warn him. My gun locked open because it was empty. [Anderson] started firing the gun he had, and I saw the guy who came out of the back room fall backwards. We all ran out of the store, and I followed [Anderson] and Stefan down Bernard Street up into this girl's house.

(T.549).

Sergeant Mariano then directed that Woods' clothing be collected and stored as evidence, in light of the surveillance

-6-

video and the fact that identifications were made partially based on the perpetrators' clothing.

Following a suppression hearing, the trial court precluded Woods' statement to Officer Cassidy that he was right-handed on the basis that the prosecution failed to serve the defense with notice of their intention to use that statement at trial. However, the trial court denied the remainder of Woods' motion to suppress his statements, finding that they were made after Woods knowingly waived his constitutional rights; that Woods was not intoxicated, ill, or injured during the interview process; and that there was nothing in Sergeant Mariano's conversation with Woods that would confer "a benefit on [Woods] that would cause those statements to be coercive in any way." (Suppression Decision at 10). The trial court also denied Woods' motion to suppress his clothing, finding that it was "seized only after there was information from the investigators regarding a description of the clothing worn by the perpetrators of the robbery[,] only after there was a viewing of a videotape regarding clothing of the particular individuals involved in that robbery and only after the officers themselves had observed [that] the clothing of the defendant Wesley Woods appeared to match those described by other individuals and that on the videotape." (Id. at 11).

## C.    The Defense Request Regarding the 911 Tape

After the prosecution concluded their case-in-chief, defense counsel asked the trial court for a one-day adjournment because he was attempting to locate an additional witness, a police officer whose voice could be heard on the 911 tape. Defense counsel noted that in the 911 transcript, there was "a statement from a police officer in sum and substance that they may have seen a car leaving 466 Bernard Street. The 911 records attribute that statement Officer Romeo." Counsel said that, just before he questioned Officer Romeo yesterday, he found out that the 911 records were inaccurate and that it was not Officer Romeo who made the statement in question. (T.645). Defense counsel stated that he thought it may have been Officer Steven Royka. He had requested the prosecutor's assistance in locating Royka, but the prosecutor had been unable to reach him at his home phone number. The prosecutor contacted the RPD and learned that Royka was on vacation until July 14, 2008. Defense counsel proceeded to request an adjournment to attempt to locate Officer Royka, and in the alternative, to request that the jury be allowed to hear that particular portion of the 911 tape, on the basis that it is admissible as a present sense impression. Defense counsel argued that even if Officer Royka had asked a question ("Is that a car leaving from 466 Bernard?") rather than made a statement ("That is a car leaving from 466 Bernard."), it made no difference, because the asking of the question would

-8-

support the fact that Officer Royka "saw something in that area, saw a car leaving and was asking other officers, is he leaving the scene where the tracks are leading." The prosecutor replied that he believed Officer Royka had asked a question and noted that it was "very difficult to hear everything that's said on that tape. Parts of it are garbled. There is [sic] other broadcasts." The prosecutor indicated that his understanding was Officer Royka had a perimeter point on an intersection one or two blocks away from 466 Bernard Street at least initially[,]" so "[i]f that was him asking a question," it is unclear where he was at the time of the question. The prosecutor disagreed that asking a question constitutes a present sense impression since Officer Royka was not describing something he saw. During the colloquy that ensued with the trial court, defense counsel conceded that he did not know for certain that the speaker was Officer Royka but he "submit[ted]" it was that officer. The trial court pointed out that it was "unclear apparently. It's not identified in any way; is that right? [Counsel was] speculating it's Officer Royka, where he is, whether or not it's an observation or some kind of a question. It just seems totally speculative . . . at this point without more information." The prosecutor added that the 911 tape included a second robbery, with the radio broadcasts from the two incidents being mixed together on the tape. Defense counsel asserted that he believed

those references to the other robbery were much earlier in the tape.

The trial court asked whether the speaker who made "reference to a car leaving a driveway . . . specif[ied] it's 466 Bernard Street[.]" The prosecutor explained that the speaker "says something about [']there,['] and it's only if you assume it's related to a statement before or a statement after by someone else that you can draw that inference, but I think you have to make an inference. . . ." Defense counsel countered by pointing out that in 911 printout, "just before that statement is made, an officer says, canine prints stopping at 466 Bernard Street. The next transmission is [']possibly a vehicle pulled out of the driveway there[,'] followed by another transmission, something along the lines of [']they possibly went into the location.[']" The trial court then proceeded to "deny the application" because, based on what it had heard, the court "believe[d] it's too speculative[.]"

**D.  The Verdict, Sentence and Direct Appeal**

The jury returned a verdict convicting Woods as charged in the indictment of second-degree (felony) murder and first-degree robbery. On July 23, 2008, the trial court sentenced Woods to an indeterminate term of 25 years to life on the murder conviction, with a concurrent 25-year determinate term on the robbery conviction, to be followed by 5 years of post-release supervision.

On direct appeal, Woods was represented by new counsel who argued that trial counsel was ineffective in failing to timely investigate the issue of the unidentified police officer on the 911 tape; that Woods' statements to police were inadmissible due to an excessive delay in arraignment and impermissible promises of lenity by the police; that the warrantless seizure of Woods' clothing following his provision of a written statement was unreasonable; and that the sentence was harsh and excessive. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the judgment in a memorandum opinion. People v. Woods, 93 A.D.3d 1287, 940 N.Y.S.2d 747 (4th Dep't 2012). The New York Court of Appeals denied leave to appeal. People v. Woods, 19 N.Y.3d 969 (2012).

### E.   The Federal Habeas Petition

This timely habeas petition follows in which Woods seeks the following grounds for relief: (1) his statements to police should have been suppressed as involuntary; (2) the clothing seized from him without a warrant at the police station should have been suppressed; (3) trial counsel was ineffective in failing to investigate the need for a police officer's testimony; and (4) Woods' sentence was unduly harsh and excessive.

Respondent answered the petition, asserting that the defense of non-exhaustion as to the claim of ineffective assistance of trial counsel, and noting that this makes the petition a "mixed

petition" containing both exhausted and unexhausted claims. Respondent urges the Court to deny the petition under the authority of 28 U.S.C. § 2254(b)(2) because the unexhausted claim is plainly meritless, and there is no basis for granting a stay-and-abeyance for exhaustion purposes.

For the reasons set forth below, the request for a writ of habeas corpus is denied, and Woods' petition is dismissed.

## III. Discussion

### A.   Erroneous Denial of Motion to Suppress Statements

Woods asserts that the trial court erred in denying his motion to suppress his oral and written statements to the police; he claims he was detained for an unnecessarily long period of time, and would have said "anything to stop all of the questions." On direct appeal, the Fourth Department rejected his claim regarding the involuntariness of his statements, finding that although he was detained and questioned by the police for approximately 10 hours, that fact did not, by itself, render the statements involuntary. People v. Woods, 93 A.D.3d at 1288 (quotation omitted). Because this claim was adjudicated on the merits, Woods only may obtain habeas relief if the state court's adjudication was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d)(1).

The relinquishment of the rights conveyed by the Miranda warnings must be "voluntary in the sense that it was the product of

a free and deliberate choice rather than intimidation, coercion or deception[,]" and it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran, 475 U.S. at 421 (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979); citing North Carolina v. Butler, 441 U.S. 369, 374-75 (1979)). The factors to be considered include the characteristics of the accused, including his experience, background, age, education, and intelligence; and the conditions of interrogation, including police conduct, length of detention, whether the questioning was repeated or prolonged, physical abuse, handcuff restraints, the deprivation of food or sleep, and psychologically coercive tactics. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

The Court finds that record fails to support Woods' claim that he was detained for an excessive period of time and would have said "anything to stop all of the questions." The testimonial and documentary evidence indicates that Woods arrived at the police station just after 10:00 p.m., and he was left alone in an interview room until 5:20 a.m. At that time, two officers came into the room and read him his Miranda warnings, which he waived. The

officers questioned Woods for an hour, during which time he denied
any involvement in the robbery. At about 6:15 a.m., the officers
left the room, and returned shortly thereafter, informing Woods
that they had reviewed the store's surveillance tape. At that Woods
denied shooting anyone and asked for "time alone to think [about]
it." (H.249-50). About an hour later, the officers returned and
spoke with Woods, who stated that he would like to see the
surveillance video himself. Woods watched the video, and then
"immediately began to tell [them] that, in fact, he was there, and
that he didn't kill the guy, that he was shooting in the air
because he heard the one guy coming down the stairs as the robbery
was going down." (H.253). The officers began recording Woods'
written statement at 8:20 a.m. Woods made corrections to the
written statement and signed it at 8:36 a.m. The Court recognizes
that while the actual interview process, cumulatively, only spanned
a few hours, the officers did wait more than seven hours overnight
before beginning to interrogate Woods. As the Fourth Department,
found there was "no indication in the record of the suppression
hearing that [Woods] sought to end the interrogation or that his
alleged lack of sleep left him 'so . . . fatigued that he was
incapable of intelligently waiving his rights or comprehending the
meaning of his statement[s].'" People v. Woods, 93 A.D.3d at 1288
(quotation and some quotation marks omitted; ellipsis in original).
While the police officers' delay in beginning to question Woods was

lengthy, he does not argue that he was not permitted to sleep during this time or was otherwise intentionally kept awake by the police. See, e.g., United States v. Guzman, 11 F. Supp.2d 292, 298 (S.D.N.Y.) (defendant's suggestion that confession coerced due to sleep deprivation rejected where no evidence "to suggest that [defendant] expressed any fatigue he felt, or that he indicated a desire to end the interrogation") (collecting cases), aff'd, 152 F.3d 921 (2d Cir. 1998); United States v. DiLorenzo, 94 Cr. 303, 1995 WL 366377, at *8 (S.D.N.Y. June 19, 1995) ("[A] claim that a defendant was exhausted or suffering from the effects of alcohol is not, in the absence of coercive law enforcement activity, sufficient to characterize his confession as involuntary.") (collecting cases). The Court notes that approximately an hour of the interrogation process was due to a request by Woods to be "left alone" to think. See, e.g., Richter v. Artuz, 77 F. Supp.2d 385, 396 (S.D.N.Y. 1999) (no coercion found where the petitioner was present at police barracks for a "considerable amount of time," but was "questioned only intermittently and not continuously").

Woods also cites a statement by one of the police officers who interrogated him, which he claims was coercive and amounted to a promise of leniency in exchange for his confession. The parties dispute the substance of Sergeant Mariano's statements. According to Woods, Sergeant Mariano told him "that things would go better for him in court" if he made a statement, that a confession would

-15-

"look good to the legal system", and that "the Court would do [some]thing or the D.A. would do [some]thing" (H.288, 290-91). Sergeant Mariano said he told Woods, "[B]e a man, show some remorse, some concern for what you did, and maybe things will go a little easier. But I am not the guy in the black robe that is going to be the one handing out the punishments, but it couldn't hurt." (H.290). He said it would be "good" for Woods because "as a human being you ought to take responsibility for what you did because it is irrefutable in our minds what you did. So if you want to stand in a courtroom some day be [sic] a tough thug, see how it works out for you." (H.291). On direct appeal, the Fourth Department found that Sergeant Mariano's "generalized comment to . . . regarding the benefits of cooperating with the police did not constitute a promise of leniency that created 'a substantial risk that [Woods] might falsely incriminate himself[.]'" <u>Woods</u>, 93 A.D.3d at 1288 (quoting N.Y. CRIM. PROC. LAW § 60.45(2)(b)(i);[1] citation omitted).

The Court finds that the state courts did not erroneously apply federal law in rejecting this claim. The Second Circuit has

---

[1]

New York Criminal Procedure Law ("C.P.L.") § 60.45(2)(b)(i) "treats as 'involuntarily made' a statement elicited 'by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself,' but this provision does not, and indeed cannot, displace the categorical constitutional prohibition on the receipt of coerced confessions, even those that are probably true[.]" <u>People v. Thomas</u>, 22 N.Y.3d 629, 644-45 (2014) (citing <u>Rogers v. Richmond</u>, 365 U.S. 534, 545 n. 3 (1961) (stating that "whether the question of admissibility is left to the jury or is determinable by the trial judge, it must be determined according to constitutional standards satisfying the Due Process Clause of the Fourteenth Amendment")).

held that "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." United States v. Guarno, 819 F.2d 28, 31 (2d Cir. 1987) (in response to questioning, defendant indicated that he had weapons in his car and agreed to turn them over to the agents; the agents informed defendant that he would not face additional charges as a result of his possession of these weapons so long as he honored the cooperation agreement) (citing United States v. Pomares, 499 F.2d 1220, 1222 (2d Cir.) ("No specific promises were made to Pomares. He was simply informed that it would be to his benefit to cooperate. Such statements by law enforcement officials have not been considered overbearing."), cert. denied, 419 U.S. 1032 (1974); United States v. Ferrara, 377 F.2d 16, 17-18 (2d Cir.) (federal agent testified he had told defendant "if he cooperated with the United States (Attorney) I felt sure he would get out on reduced bail"; court rejected defendant's claim that agent's "'promise' render[ed] his confession involuntary as a matter of law"), cert. denied, 389 U.S. 908 (1967)). Here, "[n]o specific promises were made," Pomares, 499 F.2d at 1222, by Sergeant Mariano to Woods. Rather, Sergeant Mariano suggested, albeit rather strongly, that it might—but not necessarily would—be to his benefit to cooperate with the police. As a matter of federal law, Sergeant Mariano's statements did not amount impermissible coercion. See id.

### B.    Unreasonable Seizure of Petitioner's Clothing

Woods contends that the trial court erred in denying his motion to suppress the clothing seized from him upon his arrest. According to Woods, the police should have obtained a search warrant first. On direct appeal, the Fourth Department held that the trial court "properly refused to suppress the clothes that [Woods] was wearing when he was arrested and interviewed by the police[,]" People v. Woods, 93 A.D.3d at 1288-89, under the "plain view" doctrine. Here, as the court noted, "the clothes worn by [Woods] were in plain view when the police captured and arrested him, and brought him to the police station for questioning. The clothing fit the general description given by a witness to the crimes and as depicted in a video tape recovered by the police from a security camera in the  store at which the crimes occurred." Id. at 1289 (internal and other citations omitted).

As Respondent argues, this Fourth Amendment claim is barred from federal habeas review under the doctrine of Stone v. Powell, 428 U.S. 465, 482 (1976), in which the United States Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 481-82. The Second Circuit has explained that "nce it is established that

a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief. . . .[T]he bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim[.]" Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002).

Here, Woods does not and cannot contend that New York failed to provide appropriate corrective procedures to address his Fourth Amendment claim. Indeed, "the federal courts have approved New York's procedure for litigating Fourth Amendment claims" embodied in C.P.L. Article 710. Capellan v. Riley, 975 F.2d 67, 70 n.1 (2d Cir. 1992). Furthermore, Woods took advantage of New York's corrective procedures by litigating his Fourth Amendment claim, through trial counsel, at the pre-trial suppression hearing, and through appellate counsel on direct appeal. The Fourth Department considered Woods' claim on the merits and, after discussing it, rejected it unanimously. "[A] petitioner's mere disagreement with the outcome of the state courts' rulings 'is not the equivalent of an unconscionable breakdown in the state's corrective process.'" McClelland v. Kirkpatrick, 778 F. Supp. 2d 316, 332 (W.D.N.Y. 2011) (quoting Capellan, 975 F.2d at 72; other citations omitted).

-19-

Because Woods "can show nothing more than that he disputes the correctness of the state court's rulings, the doctrine of Stone v. Powell forbids de novo review[,]" McClelland, 778 F. Supp.2d at 333, of his Fourth Amendment claim.

## C.  Ineffective Assistance of Trial Counsel

Woods reasserts his claim, presented by appellate counsel on direct appeal, that defense counsel failed to properly prepare for trial because he did not investigate, in a timely manner, the need to call a police officer, who apparently appeared on the 911 tape. Appellate counsel argued that trial counsel had no tactical or strategic reason for being unable to locate this police officer. Counsel faulted trial counsel for not start looking for the officer until the witness was on vacation, despite having had access to the 911 recording three months prior to trial. The Fourth Department held that the claim "involve[d] matters outside the record on appeal and thus is properly raised by way of a motion pursuant to CPL article 440[.]" People v. Woods, 93 A.D.3d at 1289 (citation omitted).

Even under a de novo standard of review, Woods cannot establish ineffective assistance of trial counsel under Strickland v. Washington, 466 U.S. 668 (1984). To establish a federal claim of ineffective assistance of trial counsel, a petitioner must demonstrate that his attorney's representation fell below an objective standard of reasonableness, and that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. The Court "need only consider the second prong [of Strickland] here, for where 'it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice [than on the ground of objectively unreasonable performance] . . . that course should be followed.'" Parker v. Ercole, 666 F.3d 830, 834 (2d Cir. 2012) (quoting Strickland, 466 U.S. at 697; ellipsis and second brackets in Parker).

To analyze this claim, the Court accepted the following assumptions, urged by defense counsel to the trial court in his request for an adjournment to find the officer: that the unknown police officer on the 911 tape was indeed Officer Royka, and that Officer Royka was making a declarative statement ("That is a car leaving from 466 Bernard.") rather than asking a question ("Is that a car leaving from 466 Bernard?"). Even making these assumptions in Woods' favor, there is no reasonable probability of a different result at Woods' trial. Had Officer Royka had actually seen someone driving away from the house at 466 Bernard Street, that does not change the fact that Woods was found hiding in the attic at 466 Bernard with his co-perpetrators within minutes of the robbery; that, after watching the store surveillance video, he almost immediately confessed to planning and participating in the robbery; that his fingerprint was on one of the guns used in the robbery;

and that he was wearing the same clothes described by the only eyewitness to the robbery. (See T.401-02, 540, 595). Had Officer Royka testified, as the defense hoped, that he had seen a car leaving the driveway at 466 Bernard, such evidence would not have created a reasonable doubt in the jurors' minds where one otherwise did not exist.

### D.   Abuse of Discretion in Sentencing

Woods asserts that the trial court abused its discretion and imposed an unduly harsh and excessive sentence. The Fourth Department summarily rejected this claim.

"[A] petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court." Hogan v. West, 448 F. Supp. 2d 496, 519 (W.D.N.Y. 2006) (citing Fielding v. LeFevre, 548 F.2d 1102, 1109 (2d Cir. 1977) (petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports); other citation omitted). Although Woods' sentence of 25 years to life represents the maximum sentence allowable for the crime of felony murder, it nevertheless is within the permissible statutory range for such a conviction. "A challenge to the term of a sentence does not present a cognizable constitutional issue if[, as is the case here,] the sentence falls within the statutory range." Hogan, 448 F. Supp.2d

at 519 (citing <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992);

<u>Ross v. Gavin</u>, 101 F.3d 687 (2d Cir. 1996) (unpublished opn.)).

**IV. Conclusion**

For the reasons stated above, the request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because there has been no substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

S/Michael A. Telesca

_____
       HON. MICHAEL A. TELESCA
       United States District Judge

DATED:     March 22, 2017
           Rochester, New York